IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**TROY HOWELL**                                                                                           **PLAINTIFF**

**V.**                                    **CASE NO. 3:23CV33-MPM-DAS**

**NORTHWEST MISSISSIPPI COMMUNITY
COLLEGE**                                            **DEFENDANT**

**ORDER**

This cause comes before the court on the motion of defendant Northwest Mississippi Community College ("NWMCC") for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Troy Howell has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is an age and race discrimination case arising out of the 2022 non-renewal of plaintiff's contract as head women's basketball coach at NWMCC. Howell was hired as an assistant basketball coach at NWMCC in 2011, and he worked at that position for eight years. [Depo. of Howell at 8-9]. Howell was later promoted to Head Coach of the women's basketball team, thereby becoming NWMCC's first African American head coach of any sport. [Depo. of Howell at 7-8]. On May 16, 2022, Howell was given notice that his employment contract would not be renewed for the following season. [See Defendant's Exhibit A.] In providing its reasons for this decision, defendant cites a number of factors, including allegations of sexual harassment against plaintiff and disputes which he had with campus police. Plaintiff was fifty-nine (59) years old at the time of his firing, and he was replaced by LaTaryl Williams, who is described by the parties as an African-American male in his thirties.

Feeling aggrieved, Howell filed a Charge of Discrimination with the EEOC, claiming that the non-renewal of his employment contract was rooted in age and race discrimination. The EEOC dismissed the charge without further investigation and issued a Notice of Right to Sue on December 5, 2022. On February 24, 2023, plaintiff filed this civil action, claiming race discrimination in violation of Title VII and 42 U.S.C. § 1981 and age discrimination in violation of the Age Discrimination in Employment Act. Defendant has presently filed a motion for summary judgment, arguing that there is no genuine issue of fact regarding its liability for either claim and that it is entitled to judgment as a matter of law.

**Legal Standards**

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A genuine dispute as to material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). A fact is "material" if its resolution in favor of one party may affect the outcome of the case. *See Saketkoo v. Adm'r of Tulane Educ. Fund*, 31 F.4th 990, 997 (5th Cir. 2022) (citing *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)). At the summary judgment stage, the court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). If a moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law, the nonmoving party "must come forward with specific facts showing a genuine factual issue for trial." *Harris ex rel. Harris v. Pontotoc City Sch. Dist.*, 634 F.3d 685, 690 (5th Cir. 2011). "[A] party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of

evidence.' " *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.2d 1069, 1075 (5th Cir. 1994)). "If the nonmoving party fails to meet this burden, the motion for summary judgment must be granted." *Little*, 37 F.3d at 1075.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA also prohibits an employer from "limit[ing] ... employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect [that individual's] status as an employee, because of such individual's age." *Id.* at § 623(a)(2). Similarly, Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] sex." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, it is unlawful for an employer "to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training." *Id.* at § 2000e-2(d).

Employment discrimination claims brought under the ADEA and Title VII "typically rely on circumstantial evidence that is evaluated under the burden-shifting framework first articulated in *McDonnell Douglas*." *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of age discrimination by showing that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise

3

discharged because of his age. *Goudeau*, 793 F.3d at 474.[1] If a plaintiff establishes a *prima facie* case, the defendant bears the burden of producing evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 476. If the defendant satisfies this burden, the plaintiff must come forward with evidence that the legitimate reasons proffered were not the true reasons but instead a pretext for discrimination. *Id.*

## ANALYSIS

With the foregoing legal standards in mind, this court now addresses defendant's arguments in favor of summary judgment. In doing so, this court will first address plaintiff's age discrimination claim, which it regards as the stronger of his two claims. In concluding that triable fact issues exist regarding plaintiff's claim of age discrimination, this court need go no further than a sworn affidavit which he has submitted in support of that claim. In that affidavit, Dusty Essary, the parent of one of plaintiff's players, asserts that one of the relevant decisionmakers regarding plaintiff's firing, interim Athletic Director, Dr. Matthew Domas, specifically told him that NWMCC was firing Howell because it was "going in a different direction" and was going to hire a "younger coach." (Declaration of Essary, Exhibit "G"). In his brief, plaintiff describes this evidence as follows:

> The Declaration of Dusty Essary is solid direct evidence of age discrimination. Essary testifies as follows:
>> My daughter was an incoming freshman at Northwest Mississippi Community College for the fall semester of 2022. My daughter planned to play on the women's basketball team. My daughter chose to attend Northwest in large part because of Coach Troy Howell. When I learned that Coach Howell was not going to be the Women's Basketball Coach for the 2022 season, I called the interim Athletic Director, Dr. Matthew Domas. Dr. Matthew Domas told me the school was "going in a different direction" and was going to hire a "younger coach."
>
> This is direct evidence of age discrimination. The statement was made by Dr. Domas, the Interim Athletic Director and decision-maker for the termination. The statement admits

---

[1] This court notes that similar standards apply in race discrimination cases.

4

>that Domas wanted Coach Howell fired to replace him with a younger coach. The statement was made just after Howell was fired. The Court need go no further than this as to the age claim.

[Brief at 11-12].

This court agrees that, if found credible by jurors, Essary's affidavit constitutes direct evidence of age discrimination and that, standing alone, it is sufficient to at least allow a jury to consider plaintiff's discrimination claim. Indeed, this court notes that, in an unusual step for a discrimination case of this nature, defendant elected not to submit a reply brief addressing plaintiff's thorough briefing. This court therefore regards plaintiff's arguments quoted above as largely unrebutted. In so stating, this court notes that, in its initial brief, defendant did seek to pre-emptively address Essary's affidavit, with the following arguments:

>Mr. Howell apparently bases his allegation of age discrimination on *one comment* allegedly made by Dr. Matthew Domas, NWMCC Vice President of Instruction who was also serving as Interim Athletic Director at that time. Mr. Howell claims that Dr. Domas commented to a parent of a player on Mr. Howell's team about going "with a younger coach" but that statement has been denied by Dr. Domas, and further, it is inadmissible hearsay and cannot corroborated. Dr. Domas has been deposed in this case, and he was specifically asked about this conversation which allegedly took place:
>Q: Did you ever make a statement to anyone words to the effect I'm going to go with a younger head coach?
>A: I did not.
>*See* Exhibit D, page 21, lines 14-17.

[Brief at 6].

This court finds all of defendant's arguments quoted above to be unpersuasive, and it regards its argument that Dr. Domas' alleged statement constitutes "inadmissible hearsay" to be simply incorrect. In so stating, this court notes that Federal Rule of Evidence 801(d) plainly provides a hearsay exception for "admissions by a party opponent," as follows:

>A statement that meets the following conditions is not hearsay:
>(2) An Opposing Party's Statement. The statement is offered against an opposing party and:

5

> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

FRE 801(d)(2)(D). There is no question that Dr. Domas made his alleged statement while he was acting as NWCC's "agent or employee," and his comments clearly were made in the course and scope of his duties as the acting athletic director. In its brief, defendant argues that "[o]ther NWMCC personnel were questioned about this comment allegedly made, but these witnesses had no knowledge of any such comment ever being made." [Brief at 6]. It seems clear to this court, however, that an NWCC employee's professed lack of knowledge of a particular comment being made does not mean that Dr. Domas did not make the statements in question to Essary. Moreover, it seems clear that jurors are not required to believe arguably biased representations by NWCC's own employees regarding Dr. Domas' state of mind, just as they are not required to believe Essary's account.

This court notes that, in his brief, plaintiff buttresses Essary's affidavit with his own testimony that NWMCC's President Michael Heindl expressed surprise when he learned how old plaintiff was. Specifically, plaintiff writes that:

> On one occasion, Dr. Heindl asked Howell his age. (Depo. of Howell at 47). When Coach Howell replied, Heindl exclaimed, "Wow, I didn't know you were that old!" (Depo. of Howell at 47).

[Brief at 6]. This court regards this testimony as less helpful for plaintiff's case than Essary's affidavit, both because it involves plaintiff's own self-serving testimony and because Heindl's alleged statement is less directly tied to the decision to fire him. Nevertheless, plaintiff's testimony, if accepted as truthful by jurors, may well make them more likely to conclude that his age figured prominently in the minds of defendant's decisionmakers when they decided to fire him.

In the court's view, Essary's affidavit quite arguably constitutes direct evidence of discrimination, so as to take plaintiff's ADEA claims outside the scope of the *McDonnell Douglas* framework for circumstantially proving discrimination. Assuming for the sake of argument that *McDonnell Douglas* applies to plaintiff's ADEA claim, however, it seems clear that, given that plaintiff was replaced by a much younger man, he is able to raise a *prima facie* case of age discrimination, thereby placing the burden of proof upon defendant to provide a non-discriminatory reason for terminating him.

In explaining its decision to fire plaintiff, defendant argues in its brief that:

> During his employment at NWMCC, there were multiple events involving Mr. Howell, including but not limited to incidents with campus police when Mr. Howell exhibited reckless or disrespectful behavior, a vandalism event, a sexual harassment claim, and management issues with the women's basketball team.

[Brief at 1]. Plaintiff takes serious issue with each of these stated reasons. With regard to the vandalism accusation against him, for example, plaintiff writes that:

> The "parking spot" issue is astonishingly pretextual. Coach Howell and the head soccer coach Mark Hogan engaged in various pranks, such as are common amongst athletes and coaches. (Depo. of Howell at 12-15). For instance, Coach Hogan might turn all of Coach Howell's photos in his office upside down, and similar antics. (Depo. of Howell at 15). During these shenanigans, Coach Howell jokingly spray painted his name on a parking spot near the stadium and soccer field. (Depo. of Howell at 14-15). Administration told Coach Howell to remove it and he promptly did so. (*Id*.). It was a non-issue and Coach Howell was not disciplined. (Depo. of Howell at 15). Only when the school decided to fire Coach Howell was the incident viewed as "vandalism." (Depo. of Heindl at 30).

> This same analysis applies to what NWMCC now considers sexual harassment. Coach Howell removed a cell phone from a female colleague's back pocket. (Depo. of Howell at 18-19). Coach Howell was not disciplined in any way for the incident. (Depo. of Howell at 19; Declaration of Howell at 4, attached to Pl.'s Resp. as Exhibit "F"). Only when he was fired did NWMCC reference this past act. (Depo. of Horton at 19). In fact, Howell's contract was renewed after the incident. (Depo. of Horton at 19).

[Brief at 5].

Once again, defendant submitted no reply brief in this case, and it has thus provided no arguments in opposition to plaintiff's above-quoted arguments. While this court has, as discussed below, serious issues with plaintiff's interpretation of some of the facts of this case, it concludes that Essary's affidavit provides sufficient direct evidence of age discrimination to allow jurors to consider this claim. Defendant's motion to dismiss plaintiff's ADEA claim will therefore be denied.

Having concluded that triable jury issues exist regarding plaintiff's age discrimination claim, this court now turns to his allegation that his African-American race was also a factor in his termination. In considering this race discrimination claim, this court notes that plaintiff faces a somewhat lessened burden of proof than applies to his age discrimination claims. This is because while the U.S. Supreme Court has made it clear that a "but for" standard of causation applies to ADEA claims, *see Gross v. FBL Financial Services, Inc.,* 557 U.S. 167 (2009), the plain language of Title VII permits a plaintiff to obtain at least some recovery (such as attorneys' fees) in cases where he is able to prove that race discrimination was at least one "motivating factor" behind his termination. *See* 42 U.S.C. § 2000e-2(m).

It is thus apparent that plaintiff faces a considerably more forgiving burden of proof as to his claims of race discrimination, but this court believes that he needs such a forgiving burden, since he concedes in his brief that:

> NWMCC hired LaTaryl Williams to replace Howell. Williams is in his thirties. Williams is African American. Howell was fifty-nine when he was terminated.

[Brief at 6]. In the court's view, these basic facts render plaintiff's age discrimination claim considerably stronger than his race discrimination claim, since it becomes much more difficult for him to argue that he was fired based on his race when he concedes that he was replaced by another African-American. Indeed, the question arises as to whether this court is required by law

to dismiss plaintiff's race discrimination claim based on his failure to meet the fourth requirement of the *prima face* test, quoted above. In arguing that there is no hard-and-fast rule requiring such, plaintiff writes in his brief that:

> Fifth Circuit precedent does not allow an employer to immunize itself by hiring a replacement of the same race as an employee it discriminated against. *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 n.7 (5th Cir. 1997). The Court in *Nieto* held:
>> The district court held that Nieto failed to establish a prima facie case of discrimination because the plaintiff's position was immediately filled by a member of the same protected class. The Supreme Court "has not directly addressed the question whether the personal characteristics of someone chosen to replace a Title VII plaintiff are material…." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 527 n. 1, 113 S. Ct. 2742, 2758 n. 1, 125 L. Ed. 2d 407 (1993) (Souter, J., dissenting). Cf. *O'Connor v. Consolidated Coin Caterers Corp*., ____ U.S. ___, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is … irrelevant, so long as he has lost out because of his age"). Recent cases in our circuit support the district court's view that a plaintiff's replacement by a member of the same protected class precludes the establishment of a prima facie case. *See Singh v. Shoney's Inc.,* 64 F.3d 217, 219 (5th Cir. 1995); *Allison v. Gulf Employees Credit Union*, 836 F. Supp. 395, 397 (E.D. Tex. 1993), aff'd mem., 32 F.3d 565 (5th Cir.1994). These recent cases ignore earlier precedent in this circuit, however, which explicitly recognized "that the single fact that a plaintiff is replaced by someone within the protected class does not negate the possibility that the discharge was motivated [by] discriminatory reasons." *Hornsby v. Conoco, Inc*., 777 F.2d 243, 246-47 (5th Cir. 1985) (*citing Byrd v. Roadway Express, Inc.,* 687 F.2d 85, 86 (5th Cir. 1982)). It bears noting that our earlier precedent on this point continues to be controlling law in this circuit. *United States v. Gray*, 751 F.2d 733, 735 (5th Cir. 1985). While the fact that one's replacement is of another national origin "may help to raise an inference of discrimination, it is neither a sufficient nor a necessary condition." *Carson v. Bethlehem Steel Corp*., 82 F.3d 157, 159 (7th Cir. 1996). To the extent that the district court concluded otherwise, such conclusion was not supported by the controlling authority in this circuit.

[Brief at 10-11].

In the court's view, this is the sort of argument that defendant could, and should, have addressed in a rebuttal brief if it did not regard it as accurate. The absence of a rebuttal aside, this court has conducted its own review of the authority cited by plaintiff, and none of the helpful authority he cites have been overruled by the Fifth Circuit. Indeed, this court notes that, in *Byrd,*

9

the Fifth Circuit made clear its intent not to regard the fourth requirement of the *prima facie* standard as an absolute one, writing that:

> In *Marks v. Prattco*, Inc., 607 F.2d 1153, 1155 (5th Cir. 1979), this Court held that a prima facie case of discriminatory discharge may be made out by a showing that the plaintiff (1) is a member of a protected minority; (2) is qualified for the job from which he was discharged; (3) was discharged; and that (4) the open position was filled by a non-minority. The district court ruled that Roadway's uncontroverted proof of the converse of the fourth element of the *Prattco* test, i.e., of Byrd's replacement by a black, conclusively eliminated the possibility that Byrd might establish a prima facie case of discriminatory discharge. But as this Court and the Supreme Court have repeatedly pointed out, no single formulation of the prima facie evidence test may fairly be expected to capture the many guises in which discrimination may appear. *Furnco Construction Corporation v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Jones v. Western Geophysical Company of America,* 669 F.2d 280, 284 (5th Cir. 1982); *Coleman v. Braniff Airways, Inc.*, 664 F.2d 1282, 1284-85 (5th Cir. 1982); *Hedrick v. Hercules*, 658 F.2d 1088, 1093 n.4 (5th Cir. 1981);

*Byrd,* 687 F.2d at 86.

This court further reiterates that *Goudeau's* formulation of the fourth *prima facie* requirement requires the plaintiff to demonstrate that "(4) he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Id.* at 474. Although written in the age discrimination context, the "or otherwise discharged because of" language in *Goudeau* clearly seems to contemplate the possibility that a discrimination plaintiff will be able prove his *prima facie* case even if he was not replaced by someone outside of the protected class. Plaintiff thus appears correct in his assertion that defendant is not necessarily entitled to a dismissal of the race discrimination claim against it based solely on the fact that it hired another African-American to replace him. It does seem clear, however, that this fact is a quite unhelpful one for plaintiff, and it clearly raises the bar for him to produce other evidence suggesting that race was at least a motivating factor in his firing.

10

In his brief, plaintiff alleges that, in spite of a winning record, he was treated worse than white coaches by NWCC, writing that:

> Coach Howell was given positive performance reviews and had no complaints during two (2) basketball seasons. (Depo. of Howell at p. 10). Coach Howell had two (2) "winning" seasons (winning over 50% of the games) and a losing season only during the height of the Covid pandemic in 2020. (Depo. of Howell at 11).
> Dr. Matthew Domas assumed the role of Interim Athletic Director in 2022. (Depo. of Matthew Domas at 6, attached to Pl.'s Resp. as Exhibit "B"). Everything changed under Domas's reign. Soon after Domas assumed the role, he and Coach Howell had an argument regarding player letters of intent ("LOI"). (Depo. of Howell at 34). Dr. Domas berated Howell and corrected Howell in front of other coaches for doing the LOIs "wrong." (Depo. of Howell at 34-35). It turned out Domas was wrong, and Howell was right. (Depo. of Howell at 35). While Domas confessed and apologized to the other (white) coaches, he never apologized to Coach Howell. (*Id.*).
> Coach Howell explained in his deposition how Dr. Domas always took the "white person's" side in any issue. (Depo. of Howell at 36). When a simple issue arose between Coach Howell and a restaurant supplying food to the basketball team, Domas predictably refused to hear Coach Howell's side of the story and admonished Coach Howell. (*Id.*).

[Brief at 2]. While this court does not dismiss these allegations of favoritism shown to white coaches, they may be regarded by jurors as quite subjective allegations rather than hard proof of discrimination.

In arguing that fact issues exist regarding whether he was terminated on the basis of his race, plaintiff makes one allegation which, this court believes, stands well above the others. Specifically, plaintiff alleges that he was told by Dr. Heindl that he was being fired because he did not "talk" and "act" like the other coaches. Specifically, plaintiff testified in his deposition that:

> Howell: I recall I called and talk to Dr. Heindl and I kept trying to get in touch with him afterwards -- after I got the news that he had not signed me -- well, not taken me back. And I tried to get him to ask -- I kept asking him Why, why, why. And he said, Coach, you just don't talk and act like the other coaches. I took that to be racist -- on my race.
> Q: And so, that's a statement, though, that you contend that Dr. Heindl made to you after you had been nonrenewed, correct?
> Howell: That statement he made, yes.

[Howell depo. at 41]. At his deposition, Dr. Heindl confirmed that he had a conversation with plaintiff after his firing, but he denied making the remarks attributed to him. [Heindl depo. at 41-42].

This court notes that plaintiff's allegation in this regard may be viewed by jurors with greater skepticism than Essary's testimony regarding Dr. Domas' alleged age-related remark, since the latter comes from a witness with no financial interest in this litigation. Nevertheless, this court is required, at the summary judgment stage of proceedings, to view the facts in the light most favorable to plaintiff, as the non-moving party. That being the case, this court cannot simply proclaim that plaintiff is lying in this regard, and it will assume for the purposes of this motion that Dr. Heindl did, in fact, cite plaintiff's not "talking" or "acting" like the other coaches in justifying his termination. This court regards this assumption as legally significant, since an employer's decision to disfavor one black employee or candidate because he subjectively perceives him as "talking" or "acting" in a manner which is "too black" seems like the sort of decision which Title VII was enacted to prevent. Moreover, this court would not be living in the real world if it sought to deny that there are some employers who are perfectly fine with hiring an African-American employee, so long as they do not perceive them as being "too black." In so stating, this court emphasizes that this observation is purely a general one, and it is not intended to express this court's views regarding this case. Nevertheless, if plaintiff's statement regarding Dr. Heindl's alleged concerns about how he "talk[ed]" is believed by jurors, then it at least seems possible that this evidence could support a race discrimination claim in this case.

In this vein, this court notes that, in *O'Connor*, the U.S. Supreme Court wrote that:

> The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against

> employees because of their age, but limits the protected class to those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.*

*O'Connor,* 517 U.S. at 312. These words were written in an age discrimination context, but this court is inclined to agree with plaintiff that they demonstrate that the mere fact that plaintiff was replaced by another African-American does not, standing alone, preclude the possibility that he was fired, at least in part, due to his race. Indeed, just as one job candidate may be older than another within the protected class of the ADEA, this court believes that one African-American candidate may be perceived by his employer as being "blacker" than another. In cases where the employer chooses to fire an employee specifically because he regards him as being "blacker" than another candidate, this court can discern no reason why this should not be regarded as an unlawful employment decision based on race. In so stating, this court emphasizes once again that this observation is purely a general one, since it has no idea whether this scenario is present in this case.

Having made these general observations regarding the law in this context, this court notes for the record that it does not regard plaintiff's race discrimination claims as being particularly strong ones in this particular case. Certainly, the fact that plaintiff was replaced by another African-American is the main reason for so concluding, but this court also does not regard certain evidence in this case as being the strong proof of racism which he does. For example, plaintiff has submitted body camera video taken by a campus police officer which depicts a traffic stop he made involving a black female student. In his brief, plaintiff describes the stop as follows:

> Coach Howell observed racial discrimination by the NWMCC Police Department during his employment. (Depo. of Howell at 51). One event which NWMCC claims motivated Coach Howell's termination included two (2) white officers who stopped an African American female basketball player. (Depo. of Howell at 23). The event was captured on video. (Video recording, attached to Pl.'s Resp. as Exhibit "C"). Coach Howell

13

> peacefully walked by the area and stated the multi-officer stop "didn't look good." (Id.). The officer was incensed by Coach Howell's comment. (Id.). The video shows the officer make a call to the station explaining he was "tired of this worthless ass basketball coach" and would "hook his ass up next time." (Id.). The racism depicted on the video is palpable.

[Brief at 2].

This court has carefully reviewed the video in question, and, having done so, it appears that the evident anger displayed by the officer in the video simply reflected his annoyance over a basketball coach attempting to tell him how to do his job. In so stating, this court observes that the officer was at all times polite and respectful to the female student, and there is nothing in the traffic stop which seems improper, at least to this court's eyes. Indeed, the officer states in the video that he "clocked" the student driving thirty-one miles per hour in a twenty-mile per hour speed limit area, and plaintiff was clearly not in a position to know whether the officer had good cause to stop the student or not. Moreover, the officer demonstrated considerable leniency to the student, such as by choosing not to cite her for an expired license and by allowing her to address the speeding citation with campus traffic authorities, thereby preventing her insurance rates from being adversely affected. In the video, plaintiff objected to the multi-officer stop, but this court can discern no reason why the fact that another officer was quietly and passively observing the traffic stop constitutes any proof of racism.

In light of the foregoing, the video in question frankly strikes this court as quite being more helpful evidence for defendant than plaintiff in this case, since it appears to depict a basketball coach who is overstepping his bounds. In his brief, plaintiff notes that NWCC's representative stood behind its officer's actions and argued that Howell's own actions during this stop were inappropriate. Specifically, plaintiff writes that:

> Surprisingly, NWMCC concedes Coach Howell's interaction with campus police motivated his termination. (Depo. of Jeff Horton at 15-16, attached to Pl.'s Resp. as

> Exhibit "D"). Jeff Horton, the Vice President of Administration and Finance of NWMCC and one of the decision-makers regarding Coach Howell testified as follows:
>> Q. Now, the next one, the traffic stop. What did Coach Howell do wrong during the traffic stop?
>> A. Well, we had -- an officer had a student pulled over and was addressing her traffic violation, and he comes in and exchanges his objection to how the police officer is doing his job.
>> Q. Have you watched the video of that stop?
>> A. I have.
>> Q. Coach Howell walks by the officer and said, it doesn't look good with a bunch of cops making a single traffic stop. That's about what he said, right?
>> A. That's about what he said, right.
>> Q. You find that disrespectful?
>> A. Absolutely. You know, the police officer is just doing his job. It's just a typical traffic violation. Nothing objectionable is going on per the video, and for some reason Mr. Howell makes the decision to interject himself.
>> Q. And his comment to the police officer that it doesn't look good, bad optic, that's one of the reasons he was nonrenewed, isn't it?
>> A. One of the reasons, again, yes. Again, bad judgment. Why would you decide to get involved in a perfectly calm, professional traffic stop? His colleagues are just doing their job.

[Brief of plaintiff at 1-2, citing Depo. of Horton at 15-16].

This court had the same reaction to the video which NWCC's representative did, and it suspects jurors will view the video in a similar light. That being the case, this court submits that plaintiff should seriously consider whether he wishes to go to trial solely on his age discrimination claim if he wishes to portray the traffic stop in question as evidence of racism. Plaintiff further notes in his brief that he "had complained of racism in the campus police department many times before the videotaped incident," [brief at 3] and, in providing specifics in this regard, he writes that:

> For instance, on one occasion, Coach Howell watched a white officer allow a white female to walk through an area in the stadium to exit. (Depo. of Howell at 27-29). However, when two (2) of Coach Howell's black players attempted to exit the same route, the officer would not allow them to do so. (*Id.*). Coach Howell approached the officer to question why the black students were treated differently. (*Id.*). NWMCC determined that Coach Howell's interaction with the white officers was "disrespectful" and further motivated his termination. (*See, e.g.,* Depo. of Horton at 11). Coach Howell once observed an incident in which a white police officer needlessly berated a group of

>black kids at a football game. (Depo. of Howell at 31-33). Coach Howell complained to the Athletic Director. (*Id.*). This is but some more of what NWMCC describes as Coach Howell's "problems with campus police" (Depo. of Matthew Domas at 9-10).

[Brief at 3-4]. This court cannot speak to the other instances in which plaintiff interjected himself into campus police activities, but, given that it was videotaped, the traffic stop discussed above seems certain to play an outsized role at trial in the jurors' perception of plaintiff's interactions with campus police. This court doubts that this role will be nearly as positive for plaintiff as he appears to anticipate.

This court further notes that allegations that plaintiff was fired for opposing racism on campus seem much better suited for a retaliation claim than a discrimination one. In this vein, this court notes that plaintiff did not assert such a retaliation claim either before the EEOC or this court, and it would be far too late for him to seek to do so now. This court does not question plaintiff's failure to assert such a claim, since complaints about alleged racism towards students do not appear to implicate Title VII's retaliation provision, and the Fifth Circuit has not recognized Fourteenth Amendment retaliation claims. *See, e.g. Cox v. Scott Cnty. Sch. Dist.*, 2021 WL 1207718, at *13 (S.D. Miss. Mar. 30, 2021). While it is arguable that allegations that an employee was fired for "acting too black" in a general sense might be regarded as being fired for a racial "characteristic," this court believes that there is a limit to how far a plaintiff may validly go in this regard, lest a discrimination claim be improperly transformed into a Fourteenth Amendment retaliation claim. Once again, such a claim does not appear to exist in this circuit and, at any rate, was not asserted either before the EEOC or in the complaint.

While this court thus doubts that a discrimination claim could validly cover acts of opposition to perceived discrimination, it is given pause by plaintiff's allegation that he was told that he did "talk" or "act" like the other coaches. This court is required to view this, and all other summary judgment evidence in the light most favorable to plaintiff, and defendant's failure to

16

submit a reply brief leaves it in an even worse position to seek summary judgment on these issues. Given these facts, and considering that a trial will be required regardless, this court concludes that it should wait until the directed verdict stage of trial to decide whether to submit race discrimination claims to the jury.

While this court will seriously consider granting directed verdict on plaintiff's race discrimination claims, it notes that judicial economy considerations arguably favor allowing jurors to make findings regarding race discrimination in this case. In particular, this court notes that it is quite easy for the Fifth Circuit (or this court on JNOV) to simply strike juror findings which it finds to be unsupported by the evidence, while correcting an erroneous dismissal of a claim requires an entirely new trial. That being the case, judicial economy considerations quite arguably favor this court's allowing the jurors who have already heard the evidence to make findings regarding all potentially applicable claims. At the same time, this court reiterates its belief that plaintiff, and his counsel, should take a hard look at the video evidence in this case, as well as the fact that he was replaced by another African-American, and ask whether they wish to spend their credibility before jurors in arguing that he was fired on the basis of his race. With this caveat, this court declines to dismiss plaintiff's race discrimination claim at this stage of the proceedings, although it may choose to do so at the directed verdict stage.

In light of the foregoing, it is ordered that defendant's motion for summary judgment is denied.

This, the 15th day of April, 2024.

      /s/ Michael P. Mills
      UNITED STATES DISTRICT JUDGE
      NORTHERN DISTRICT OF MISSISSIPPI